## Case No. 16,246.

### UNITED STATES v. SEARS.

[1 Code Rep. 128; 1 West. Leg. Obs. 80.]

District Court, D. Iowa. Jan. Term, 1849.

POSTMASTERS—ACTION ON OFFICIAL BOND—LIMITATION.

A suit was instituted by the United States against the surety of a postmaster on the official bond, nearly three years after the date of the last item charged against him in the accounts with the department. *Held,* that the action was barred by the third section of act of congress of 1825 [4 Stat. 103].

This was an action of debt against the defendant [Daniel Sears], as one of the securities of Samuel Shuffleton, deceased, late postmaster at Fairfield, in this state. Alleged breach of the bond, that the said "Shuffleton did not well and truly execute the duties of the said office of postmaster, aforesaid, but made default therein, as follows, to wit: At Fairfield, in the county of Jefferson, on the 8th day of October, A. D. 1846, a large sum of money of the said plaintiff, viz. $700, came into the hands and possession of said Shuffleton, in his capacity of postmaster, which large sum of money said Shuffleton hath not paid or accounted for in the manner prescribed by the postmaster-general," &c. Plea of the statute of limitations, to which the plaintiff replied.

C. W. Slagle, for defendant, contended that the third section of the act of 1825 releases the obligor in the bond, if suit is not brought within two years from the time of default; that the thirty-second section of the same act makes it the duty of the postmaster to account with the department at the end of every three months and pay over the balance. Shuffleton's last account was rendered September 22, 1845, at which time he was in default. This suit was commenced September 1, 1848, nearly three years from the time of the default.

J. M. Preston, U. S. Atty., took the ground that the certificate of the auditor of the post-office department, which was dated October 8, 1848, was the true time from which the statute should run; and that two certain drafts drawn on Shuffleton, within two years before the commencement of this suit, brought it within the statute.

---

## Case No. 16,247.

### UNITED STATES v. SEARS et al.

[1 Gall. 215.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1812.

EMBARGO ACTS — INSPECTION OF VESSEL — GOODS ILLEGALLY LADEN—PROOF OF INSPECTOR'S APPOINTMENT—OBSTRUCTION.

1. An inspector is an officer of the customs, the obstruction of whom is an offence within the 71st section of the collection act of 1st March, 1799, c. 128 [1 Story's Laws, 633; 1 Stat. 678, c. 22]. An inspector had a right to go on board of any vessel, to discover if any goods, &c. were illegally laden on board, contrary to the embargo acts; and if obstructed in so doing, an indictment lay under said 71st section.

[Cited in Hooper v. Fifty-One Casks of Brandy, Case No. 6,674.]

[Cited in Jones v. Gibson, 1 N. H. 271.]

2. If an inspector be commissioned and sworn, and in the actual execution of the duties of the office, with the knowledge of the treasury department, it is sufficient proof of his being regularly appointed, even supposing (which may be doubted) that the approbation of the secretary of the treasury were necessary to such specific appointment.

[Cited in U. S. v. Bachelder, Case No. 14,490; Frelinghuysen v. Baldwin, 12 Fed. 397.]

[Cited in Bishop v. Cone, 3 N. H. 516. Cited in brief in Com. v. Ford, 5 Pa. St. 68.]

---

[1] [Reported by John Gallison, Esq.]

3. On a trial for obstructing an inspector, it is not necessary to produce the commission of the collector who appoints him. Proof that the collector acts in such office de facto is sufficient.

Indictment for resisting Chipman, an inspector of the customs, in the execution of his office, viz. in attempting to enter the schooner Dinah, for the purpose, as was alleged, of ascertaining, first, whether any breach of the law had been committed; secondly, whether goods were on board, intended to be illegally exported. A verdict of "guilty" having been found against all the defendants, Prescott, of counsel for the defendants, moved for a new trial, for the following reasons:—(1) That an inspector is not an officer within the 71st section of the collection law. (2) That no evidence was produced of the secretary's having approved the inspector's appointment, in conformity to section 21. (3) That the collector's commission should have been produced; the United States choosing to rely on documents, not on reputation. (4) That there was no evidence, that the defendants knew Chipman as an inspector, claiming to act as such. (5) That the court instructed the jury, that an inspector had a right to enter for either of the purposes mentioned in the indictment.

The motion for a new trial was argued by Mr. Prescott, for defendants, and by Mr. Blake, Dist. Atty., for the United States.

As to the first reason, Prescott contended, that the collector, naval officer and surveyor, were alone to be considered as officers, within the meaning of section 27 of the coasting act (2 Laws U. S. 191), and section 71 of the collection law. 1 Story's Laws, 633 [1 Stat. 678, c. 22]. The 21st section of the collection law describes the officers' duties, after having first named them, and among the collector's duties is, "with the approbation of the principal officer of the treasury department, to employ proper persons as weighers, gaugers, measurers and inspectors, at the several ports within his district." The inspector is appointed only for a single port in a district. By the 54th section, inspectors are, together with others, authorised to go on board vessels for certain special purposes. By section 71, it is made unlawful to impede, &c. any officer of the customs, or their deputies. Inspectors, &c. are, in all cases but one provided in section 54, to be considered as always acting under the direction and superintendence of the collector.

On the second reason, Prescott did not enlarge.

As to the third reason, he contended, that even though it might be sufficient, as to Chipman, to prove him a reputed officer of the customs, yet as he derived his authority from Otis, the collector, it was necessary to show Otis's right to appoint. Reputation can extend no farther than the agent, and does not apply to the person appointing. The record having been relied on in the first instance, it must be followed.

In support of the fourth reason, Prescott cited Tidd, Prac. 818; 3 Wils. 47.

Before STORY, Circuit Justice, and DAVIS, District Judge.

STORY, Circuit Justice, said, that Chipman's boat was not a revenue cutter, there being only ten of those commissioned by the president, and making a part of the naval force. He also remarked, that inspectors were either general or special.

DAVIS, District Judge, referred to the act of April 25th, 1808, § 7 [2 Stat. 501], "Revenue Cutters or Boats."

Prescott. Chipman appeared as cutter-master, not as inspector. There is a distinction between cutters and revenue-boats. The latter must be open row-boats, or sail-boats. Chipman's boat was not of this description.

As to the fifth reason, Prescott argued, that the statute gave no authority to the inspector to enter for the purpose of ascertaining an intended breach, and only in one case, that provided in the 54th section, authorized him to enter for the purpose of ascertaining a breach actually committed, unless under the direction of the collector. By the 68th section authority is given to the collector, naval officer, and surveyor, to search for dutiable goods (obtaining a warrant, if on land), but none to the inspector. By a section of the embargo law, vessels were to be loaded under an inspector, but this must be by direction of the collector on his permit.

STORY, Circuit Judge, suggested the case of a coasting vessel, having a cargo beyond $800, and asked, whether an inspector could not enter to ascertain, whether such vessel was about to sail without a clearance.

Blake, e contra, was told by the court, to confine himself to Prescott's two last reasons, the court having no doubt as to the others. He was also requested to speak to so much only of the fifth reason, as respected goods illegally laden for exportation. He contended, that it would have been enough to allege generally, that Chipman went on board, in the execution of his duty. An inspector may seize, as well as examine. The object of the revenue act is to search as to an offence committed; that of the 11th section of the embargo act, to search as to offences contemplated. In the case of an inspector resisted, but overcoming, and sued for an assault, he would not be required, in his defence, to show his purpose; it would be enough, if he show his authority as inspector. If an inspector may board without any reason assigned, can the indictment be bad on account of the particular fraud alleged? Blake compared this case to that of a sheriff.

In answer to Prescott's fourth reason, Blake contended, that it was not necessary that the jury should have evidence, that the defendants knew Chipman's authority. They resisted at their peril. It was like resisting a sheriff. But, in fact, their behavior to Chipman, and conversation with him, show, they were not ignorant of his character.

STORY, Circuit Justice, referred to Act (Jan. 9) 1809, § 4 [2 Stat. 507], and Act April 25, 1808, § 2. From these acts it should seem, the inspector may enter and report to the collector, whether a vessel is entitled to a clearance.

Prescott answered, that the inspector's authority cannot extend to all cases. It is confined to particular vessels; otherwise, he becomes collector.

In reply to Blake, Prescott contended, that there was not a dictum to support the extent of power, now attempted to be given to the inspector; that it could not be supposed, so large a power was intended to be given to an inferior and irresponsible officer. The 68th section of the collection law is explicit, as to the duties of officers. The collector, naval officer or surveyor, may enter to search for goods subject to duty, and concealed. There is nothing about an intention to offend. It appeared from the evidence, that the vessel was laden before the enforcing act. This act passed on the 9th March, and was received in Boston on the 16th. There was no evidence to show, that on the 20th, when the offence, if any, was committed, this act was known to the collector, much less to the inspector, then absent from the collector. No offence was committed against this act, until, after notice, the owner had refused to unload or give bond. As to the other reason, in civil causes, a verdict will be set aside, if found without evidence; a fortiori, in criminal causes. If the jurors have any knowledge upon the subject, they must disclose it at the trial under oath.

STORY, Circuit Justice, observed, that formerly such a disclosure on oath was not necessary.

STORY, Circuit Justice. The indictment charges, that on the 20th of January, 1809, one John Chipman was "an inspector and officer of the customs for the port and district of Barnstable," and on the same day, with certain assistants, "did attempt to go on board of a certain schooner or vessel called the 'Dinah,' then being at the aforesaid port of Chatham, and laden with a cargo of goods and merchandize, and about to proceed therewith on a voyage to sea; which said vessel was then and there a vessel of the United States, duly enrolled and licensed, according to the directions of the law in such case provided, for the coasting trade; and that the said John did attempt to proceed and go as aforesaid, on board of the said vessel, with the intent, and for the purpose of inspecting, searching and examining the said vessel and her papers, in order to ascertain if any breach of the laws of the United States had been committed, whereby the said vessel, or the goods and merchandize then on board, or any part thereof, was or were liable by law to forfeiture or seizure; and also to discover if any goods and merchandizes had been laden and put,

and then were on board of the said vessel, for the purpose of being exported therein from the United States, and from the port aforesaid, contrary to the laws of the United States:" and then charges that the defendants, while the said John and his assistants were "in the execution of the duty aforesaid," assaulted the said John and his assistants, and then and there resisted, obstructed, prevented and impeded them "in the execution of the laws of the United States, and of their duty aforesaid," against the statutes in such case made and provided.

At the trial the jury found all the defendants guilty, and now their counsel has moved for a new trial, as well as in arrest of judgment, upon certain exceptions, which I will now proceed to consider.

The first is, that an inspector is not an officer of the customs; for obstructing whom, an indictment lies on the 71st section of the act of 2d March, 1799, c. 128 [1 Story's Laws, 633; 1 Stat. 678, c. 22]. The charge in the indictment is, that he was "an inspector and officer of the customs;" and the latter, if properly alleged and proved, would have been sufficient to support the indictment. But we entertain no doubt that an inspector is "an officer of the customs," and so is within the purview of the 71st section. He is an officer known to and recognised by the law; his duties are in many instances prescribed, and the omission of those duties, or any fraudulent conduct in his office, will subject him to heavy forfeitures (see sections 53, 73, Act March 2, 1799 [1 Story's Laws, 664; 1 Stat. 704, c. 23]). In the same act he is sometimes called an "inspector of the revenue" (sections 30, 35, 37, 38, 40–42); sometimes an "inspector of the customs" (sections 38, 46, 53); sometimes an "officer of inspection" (sections 39, 62); and sometimes an "officer of the revenue" (section 53). It seems difficult to raise a doubt, that the officer so named is an officer of the customs. But there is a still more direct expression, which puts the meaning beyond all controversy. In section 73, it is provided, that if "any inspector or other officer of the customs" shall certify the shipment of any merchandize, without inspection, &c. he shall be subject to certain forfeitures, &c. The same act (section 25) provides, that manifests of the cargo shall be produced to such officer of the customs as shall first come on board of any vessel, on arriving within four leagues of the coast, for his inspection: and further (section 54) declares, that an inspector may go on board of such vessel for the purpose of examining such manifests. There can therefore be no possible doubt, that an inspector is, in contemplation of law, an officer of the customs. See Act March 2, 1799, c. 129. § 2 [1 Story's Laws 664; 1 Stat. 704, c. 23.]

A second objection is, that no proof was adduced at the trial, to show that the secretary of the treasury had approved of the appointment of Chipman, as inspector. The words of

the act as to this point are (section 21), that the collector "shall, with the approbation of the principal officer of the treasury department, employ proper persons as weighers, gaugers, measurers and inspectors, at the several ports within his district." It may well be doubted, if this clause require an approbation of the specific officer appointed, or amount to any thing more than that the employment shall not be created without the approbation of the secretary. But admitting that it does, the commission of the inspector reciting such approbation was proved at the trial; a copy, from the treasury department, of the oath taken by him, and an actual execution of the duties of the office, which we are satisfied was sufficient evidence to support the allegations in the indictment, and to prove him lawfully an inspector.

A third objection is, that the commission of the collector, who appointed the inspector, was not produced, and therefore there was no proof of his authority. But it is a sufficient answer to this objection, that the commission was not necessary to be proved. It was shown that the party had actually executed the duties of the office of collector for many years; and nothing more is necessary to be proved in cases punishable with the highest of human penalties, even the forfeiture of life. 2 McNal. Ev. 487; Berryman v. Wise, 4 Term R. 366; 1 Leach, 381n.; 2 Leach, 381; Harg. Law Tracts, 225, 226; 3 Camp. 432; Wightw. 67; Doe d. James v. Brown, 5 Barn & Ald. 243.

A fourth objection is, that it was not proved at the trial that the defendants knew that Chipman acted or claimed to act as inspector; and it is said, that if the jury find a verdict without evidence, it is as sufficient a ground for a new trial, as if it be found contrary to evidence; and 2 Wils. 47, and 2 Tidd, Prac. (4th Ed.) 802, are cited to support the position. Admitting the doctrine to be true, (and it may well admit of qualification,) still we are of opinion that there were facts in the case sufficient to warrant the inference made by the jury, that the defendants knew the character in which Chipman acted.

The last objection, and the only one which seemed of much weight is, that the inspector had no authority by law to proceed on board the vessel "to discover if any goods, &c. had been laden, &c for the purpose of being exported &c. contrary to the laws of the United States," according to the charge in the indictment; and therefore, if the officer were attempting to proceed for this purpose, it was not in the execution of the duties of his office: whereas the court directed the jury, that in point of law the officer had such authority. The direction of the court was given, as is supposed in the objection, and with the view of reserving the point for more solemn consideration. No statute has been shown, which directly and explicitly gives the authority to any officer of the cus-

toms. If it exists, it is an authority implied from the provisions of the acts regulating the trade of the United States. At the time when the offence was committed, as charged in the indictment, all the embargo acts were in full operation. It will be recollected that this was a coasting vessel, which by the ordinary laws, under no circumstances, could be allowed to engage in foreign trade while her license was in force; and that the proceeding on a foreign voyage, or being employed in any other trade than that for which she was licensed, subjected her to forfeiture. Act Feb. 18, 1793, c. 8, §§ 8, 32 [1 Stat. 305]. By the embargo acts these provisions were sedulously enforced, and new restrictions followed up with successively increasing rigor. A licensed vessel was not allowed to depart from port, or to receive a clearance, without giving bonds that she would not proceed to any foreign port. Act Jan. 9, 1808, c, 8, § 1 [2 Stat. 453]. The departure without a clearance, or proceeding to a foreign port, incurred the penalty of forfeiture. Id. § 3. It was declared unlawful to export from the United States any goods, wares or merchandises whatsoever, under a like forfeiture. Act March 12, 1808, c. 33, § 4 [2 Stat. 474]. No vessel was allowed to receive a clearance, unless laden under the inspection of the proper revenue officers (Act April 25, 1808, c. 66, § 2 [2 Stat. 299]); and if bound to a district adjacent to a foreign country, without the special permission of the president of the United States (Act April 25, 1808, § 6). The collectors were authorized to detain any vessel, ostensibly bound with a cargo to some other port of the United States, whenever, in their opinions, there was reason to suspect an intended violation of the law. Id. § 11. The putting on board of any ship any goods or merchandise, with an intent of illegal exportation, subjected the property to forfeiture. Act Jan. 9, 1809, c. 72, § 1 [2 Stat. 506]. The lading of goods on board ships was declared illegal, unless made by permission of the collector and under the inspection of the revenue officers. Act Jan. 9, 1809, c. 72, §§ 2, 4. Vessels already laden were required to be unladen, or to give the bonds required by the law. Id. § 3. The president of the United States was authorized to give instructions to the "officers of the revenue" for carrying the embargo into effect (Act Dec. 22, 1807, c. 5, § 1 [2 Stat. 451]); to instruct the collectors as to the detention of vessels, and of goods having an illegal destination (Act April 25, 1808, c. 66, § 11), and as to the refusal to grant clearances (Act Jan. 9, 1809, c. 72, § 10); and to employ the land and naval forces and militia of the United States in suppressing assemblages which should be resisting "the customhouse officers in the exercise of their duties" (Id. § 11). And finally, the penalties and forfeitures incurred under these statutes

were to be recovered and distributed in general, as under the collection act of March 2, 1799, c. 128.

These are a part of the provisions, which composed the system of restrictions on commerce and navigation. Almost all the provisions were to be carried into effect by the vigilance of custom-house officers. Though not expressly named, it seems quite impossible to presume, that the provisions which I have cited did not presuppose their agency. The collectors could alone grant or refuse clearances. The lading could alone be made under the inspection of the inspectors and other officers of the customs. The authority of interposing to prevent an illegal exportation or departure, or of seizing upon the commission of an offence, could not be exercised without examining the state and condition and papers of the vessel and cargo. In short, without an implied authority, from the nature of their offices and the requisitions of the laws, to enter on board, and, in the language of the indictment, "to discover if any goods. &c., had been laden, &c.,on board of the said vessel, for the purpose of being exported therein from the United States," I do not see that it could have been possible, either to execute the known provisions of the law, or to have avoided infringements of the rights of the citizens. Indeed, the authority in the president of the United States to instruct "the officers of the revenue," in carrying into effect the embargo, and aiding with military force "the custom-house officers," in the execution of their duties, presupposes that the law had already devolved these duties upon them. It is conceded that an inspector had a right to go on board a vessel to examine, &c., if any breach of the laws of the United States had been committed. Now, at the time when this transaction took place, it was a breach of law to lade goods, &c., for the purpose of illegal exportation. It would follow, therefore, that the inspector had an authority to go on board to examine into this fact. If the inspector had not this authority, neither had the collector; for it is no where expressly given; and if it be necessary or proper completely to execute other duties, it would result by implication to an inspector as well as a collector. As I have before observed, the laws seem to consider it already existing, and extend the authority to commanders of revenue boats, which by law are to be appointed for the use of surveyors and inspectors. Act March 2, 1799, c. 128, § 101 [1 Story's Laws, 633; 1 Stat. 678, c. 22]; and Act April 25, 1808, c. 66, § 7 [2 Stat. 501].

It is certainly not to be inferred from this reasoning, that officers of the customs have an unlimited authority over the commercial property of the citizens. In the nature of things they must have some implied powers. The legislature would, in vain, attempt to enumerate them; and I think it may be safely assumed, that they may exercise all powers necessary and proper to effectuate the manifest intentions of the law connected with the duties of their office. To them is committed the general management of the revenue laws, be they of exportation or importation; and I think it would be dangerous in the extreme to adopt the position that every act of theirs must be shown sub pede sigilli. They act at their peril. If they invade the rights of the citizens under color of office, this court will, I trust, be the last to afford them a shelter or a refuge.

On the whole, after some doubt and much reflection, I am now satisfied that the last objection ought not to prevail; and that the opinion of the court at the trial was well founded in principle. My search in the books has not enabled me to detect a single authority or principle, which is shaken or opposed in coming to this determination.

Judgment on the verdict.